### 17538

Mrs. Lavinia B. CHAPMAN, Appellant, v. Andrew SCOTT, Executor of the Last Will and Testament of James W. Scott, deceased, Sallie Scott, James W. Scott, Jr., Ruby Ann Scott, Walter Lee Scott and Roy Louis Scott, Respondents.

(109 S. C. (2d) 1)

*Messrs. Leatherwood, Walker, Todd & Mann* and *W. E. Bowen,* of Greenville, *for Appellant,*

*Messrs. Love, Thornton & Arnold,* of Greenville, *for Respondents,*

June 1, 1959.

LEGGE, Justice.

James W. Scott died on January 30, 1957, owning a tract of some 17 acres in Greenville County. On February 19, 1957, appellant brought this action to foreclose Scott's mortgage of said premises dated April 26, 1948, securing his note to her of that date in the principal sum of $4,250.00. After Scott's death, appellant, who had been named as beneficiary in three policies of insurance on his life, and who had possession of them, collected their proceeds, amounting to $2,293.29. The only issue before us concerns the executor's claim (disallowed by the Master, but allowed by the Circuit Judge) that Scott's estate is entitled to credit for this amount against his indebtedness to appellant.

In the absence of statutory prohibition, one may in good faith insure his own life for the benefit of anyone, regardless of whether the latter has an insurable interest in his life. 29 Am. Jur., Insurance, Paragraph 355; 44 C. J. S., Insurance, § 202. This principle is equally applicable to an assignment or change of beneficiary effected by the insured. 29 Am. Jur., Insurance, Paragraph 357; 44 C. J. S., Insurance, § 202. Though not necessary to their decision, it has been affirmed by this court in numerous cases. *Crosswell v. Connecticut Indemnity Ass'n,* 51 S. C. 103, 28 S. E. 200; *Rogers v. Atlantic Life Insurance Co.,* 135 S. C. 89, 133 S. E. 215, 45 A. L. R. 1172; *Roberts v. National Benefit Life Insurance Co.,* 150 S. C. 326, 148 S. E. 179; *Henderson v. Life Insurance Co. of Virginia,* 176 S. C. 100,

179 S. E. 680; *Warren v. Pilgrim Health & Life Insurance Co.,* 217 S. C. 453, 60 S. E. (2d) 891.

Where a creditor has been named as beneficiary of a policy of insurance on his debtor's life, his rights in its proceeds depend largely upon the intention of the parties to the insurance contract, and particularly upon that of the insured. Ordinarily he is entitled only to reimbursement for the debt due him, together with such sums as he may have paid to keep the policy in force. 29 Am. Jur., Insurance, Paragraph 1289; 46 C. J. S., Insurance, § 1162. But the fact that he is a creditor is not in itself conclusive of that issue, because, as before stated, the insured may, if so minded, make his creditor the absolute beneficiary though the amount of the policy far exceed the amount of the debt.

Because the intention of the parties, which is the key to the problem, must often be gleaned from the circumstances of the particular transaction, the numerous decisions involving conflicting claims of creditor-beneficiary and insured's executor in the proceeds of such policies are of little help in the solution of the issue now before us. Most of them concern the proceeds in excess of the debt; here the beneficiary, holding an obligation of the deceased insured much larger than the proceeds of the policies, claims the right to collect that obligation in full and to retain also the full proceeds of the policies.

Mrs. Chapman and her husband, lately deceased, operated a dairy farm, and also raised and exhibited show horses. They had no children of their own, but adopted and raised four, in addition to three nephews. James W. Scott, a colored boy, entered the Chapmans' employ about 1924, when he was some fifteen years old. He lived on their place, took care of their horses, and did other domestic and farm work. He was a faithful servant. In 1944 he bought, for $3,200.00, the tract of land in question, with a small house on it, near the Chapmans' farm. In 1948 he borrowed from Mrs. Chapman $4,250.00, on the security of the mortgage before mentioned; and about the same time he moved with his family

to the tract that he had purchased, constructed on it a horse barn, and went into the business of boarding and training show horses and ponies. He continued to do occasional work for the Chapmans, and kept their horses for them. His venture into the business of a boarding and training stable met with success for a time, and he soon increased the capacity of his barn from four to seventeen stalls. His weakness, however, was drink; and as he became more and more addicted to it his clientele left him. By the summer of 1956 he was out of the horse business and back doing occasional work for the Chapmans. On January 30, 1957, at the age of forty-eight, he fell into an abandoned well and was killed.

James Scott was survived by his widow, Sallie, and four children. Several years before his death he and Sallie had separated, she moving into the city of Greenville where she was employed; but they continued to visit each other occasionally. After Sallie moved into the city, two of the children continued for a time to live with James, but one got a job and the other went into the army; none was living with him at the time of his death.

Scott's will was dated August 28, 1945. In it he named his brother, Andrew Scott, executor and trustee; bequeathed $500.00 to Sallie in lieu of dower; and left to his children the beneficial interest in all of the rest of his property.

There was no evidence that any part of the mortgage debt to Mrs. Chapman, principal or interest, had ever been paid; and the Master found the amount due thereon, including interest at six per cent. compounded annually, and attorney's fee, totalled $8,129.20. The tract in question was further encumbered by a second mortgage (held by Mrs. Lydia P. Martin, and as to which there is no contest) securing an obligation in the amount of $1,213.72. Evidence was to the effect that the value of the mortgaged premises was between $12,000.00 and $15,000.00.

One of the policies here involved, in the amount of $310-.00, was issued by Independent Life & Accident Insurance

Company in September, 1956. It contained provision for sick benefits. James' mother was named as beneficiary. On November 5, 1956, upon his application, Mrs. Chapman was designated as beneficiary of this policy.

The other two policies with which we are concerned were issued by Metropolitan Life Insurance Company, one in 1952, the other in 1955. Each was in the face amount of $500.00, with provision for double indemnity in case of accidental death. James' mother was named as beneficiary in each of these policies. It appears from the evidence that one or both of them contained provisions for sick benefits. On December 27, 1956, upon James' application, Mrs. Chapman was designated as beneficiary of each of these policies.

The agent of Independent Life & Accident Insurance Company testified that he had handled, at James' request, the change of beneficiary under that company's policy; that James was then in arrears, but the policy had not yet lapsed.

The assistant manager of Metropolitan Life Insurance Company in Greenville County testified that James' policies with that company had several times lapsed, but were in benefit at the time when Mrs. Chapman was made the beneficiary; that James was working for Mrs. Chapman, and the company's agents had been having difficulty finding him, as he was not at home very often; that Mrs. Chapman had said that she would see that the premiums were paid, and that she would probably have to pay for his funeral expenses; and that James told him only that he wanted Mrs. Chapman made beneficiary.

Mrs. Chapman testified that James and the insurance agents came to see her, and said that his policies had lapsed. In her words: "They told me they had lapsed, and he wanted enough money to reinstate them and pay his premiums and he said he would make the policies over to me. I didn't ask him." She did not recall making any statement to the representative of Metropolitan to the effect that she would be responsible for James' debts. She paid premiums on the policies in question, to the amount of $35.00 or

$40.00. She testified that there was no agreement between herself and James that in case of his death she should apply the proceeds of the policies to his indebtedness to her.

The Master found "that Scott was having difficulty in keeping the premiums paid on these policies, some or all of which contained sick benefit clauses, and that said policies were in danger of becoming lapsed; that Scott requested and effected a change of beneficiary in each of the policies from the mother of the insured to Mrs. Lavinia B. Chapman, the plaintiff herein, she to pay the premiums thereon."

The testimony of Robert Chapman, an adopted son of Mr. and Mrs. Chapman, is pertinent to the issue here involved. He testified that upon his return from military service (which he had entered in 1952) he went to see James, and found that he was drinking heavily. In August or September, 1956, he took James out of the Greenville County jail, where he had been confined for two or three days after arrest for drunkenness, and carried him to the home of Mrs. Chapman, who gave him something to eat; and then he took him to the hospital, where he was "checked" by a psychiatrist.

Neither the policies nor the applications for change of beneficiary are in the record before us. Nor is there explanation of the minor discrepancy between the aggregate amount of the face of the policies, $2,310.00, and the amount $2,293.29, collected by Mrs. Chapman. But it appears uncontroverted that in each of the policies the designation of Mrs. Chapman was absolute on its face. The burden was therefore upon the defendants to prove that her status was that of creditor-beneficiary, not absolute beneficiary, and that James 'estate was entitled to credit, in the amount collected by her, against his indebtedness to her.

The cause being in equity, it is our duty to review the challenged findings of fact as well as matters of law. *Twitty v. Harrison,* 230 S. C. 174, 94 S. E. (2d) 879. To that end we have carefully considered all of the evidence, most of which was circumstantial as before in-

dicated; and we are satisfied that it preponderates in favor of the respondents' contention that when James designated Mrs. Chapman as beneficiary of the three policies in question he did so with the intention of securing to her reimbursement for expenditures made and likely to be made by her for premiums thereon. We conclude also from the evidence that other possible expenditures by her for his account, to which we shall later refer, were likewise intended to be secured thereby.

We do not infer from the circumstances surrounding the transaction that James intended the policies to stand as additional security for his mortgage debt. Mrs. Chapman, evidently a lady of means, was not pressing for payment of that obligation. It had been outstanding for more than eight years, during which he had paid nothing on either principal or interest; and she was apparently willing to let it run on, being content with the security of the land itself, which had greatly increased in value.

Nor do the circumstances, in our opinion, warrant the inference that James had named her as beneficiary of the policies simply to make her the object of his bounty. It was he, not she, who was in need. In addition, the practical worth of the policies was in their sick benefit provisions rather than in their face values, which were quite small; but for the fact that he died by accident, the proceeds of all three of them would have amounted to only $1,310.00.

What was of real concern to both James and Mrs. Chapman at the time of the change of beneficiary was his physical, mental and financial condition and the rather hopeless outlook for his future. He had become a confirmed drunkard; his business had been lost; he was out of regular employment; his property was mortgaged far beyond his power to redeem it. His policies, with their provisions for sick benefits, were about to lapse; if that should happen there would be no money to take care of him should he become ill, or to bury him after his death. For help in his trouble he turned, instinctively, to Mrs. Chap-

man, looking to her for that care and protection that faithful domestic servants expect from their kindly employers, and responsibility for which the latter accept as a matter of course. Mrs. Chapman realized that she would have to take care of him; that he would never be able to get back on his feet unless he should give up drinking, which did not seem likely; and that since he was still comparatively young she might have to look after him for a long time. It was important to her as well as to him that his policies not be allowed to lapse; and she agreed to pay the premiums for him. We think it reasonably inferable from these circumstances that both she and James tactily understood that the proceeds of the policies should be applied to reimburse her for such expenditures as she might have to make for premiums, for his care, and for his burial. Death came to him very shortly after he had designated her as beneficiary; and the proceeds of the policies collected by her far exceeded the amount that she had expended for his account—some $35.00 or $40.00, according to the record. She was of course under no duty to pay the excess over to his executor. As a creditor in possession, she could retain it and apply it to the mortgage obligation due her. The executor claims only that it be offset as a credit against that obligation. We think that the evidence sustains that claim.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.