18533

Wortham W. DIBBLE, Individually and as Trustee, etc., Annie Leak
Dibble Bradley and Agnes Dibble Morris, Respondents, v. Thomas
W. DIBBLE, etc., et al., Appellants.

(149 S. E. (2d) 355)

*Messrs. Marshall B. Williams,* of Orangeburg, and *Henry Hammer,* of Columbia, *for Appellant,*

*Messrs. James A. Moss,* of Orangeburg, and *Thomas Kemmerlin, Jr.,* and *Robert J. Thomas,* of Columbia, *for Respondents,*

*Messrs. Marshall B. Williams,* of Orangeburg, and *Henry Hammer,* of Columbia, *for Appellant,* in Reply.

July 14, 1966.

LIONEL K. LEGGE, Acting Associate Justice.

In this action, commenced by service of a summons and petition the petitioners, respondents here, sought to be adjudged the owners, in equal shares of a three-fourths beneficial interest in two parcels of land in Orangeburg County that had been conveyed by their uncle, Samuel Dibble, who was also their stepfather, to the respondent Wortham W. Dibble as trustee for their brother, the appellant Thomas W. Dibble. The petition further prayed termination of the trust and accounting and distribution to the petitioners of their alleged interests in the trust estate. The County Judge, to whom as Special Referee the cause was referred, found against the petitioners' contentions and recommended that the petition be dismissed. From a circuit court decree overruling that report Thomas W. Dibble has appealed.

On January 25, 1949, the parties to this action, Wortham W. Dibble, Annie Leak Dibble Bradley, Agnes Dibble Morris, and Thomas W. Dibble, who were all of the children then living of their widowed mother, Mrs. Annie L. W. Dibble, executed an agreement which, after reciting a contemplated settlement with their said mother concerning certain properties in reality theirs, but as to which she had for many years exercised control and held title, whereby she would convey some of said properties to them and retain others, proceeded to provide that thereafter "any property, money or thing" exceeding in value twenty-five dollars that should be received by any of said children from their said mother either during her life or upon her death would be shared by them equally; that semi-annually each would report to Wortham W. Dibble as their agent all things of value received from their mother; and that he would keep a record of the items so received and reported to him.

Under date January 26, 1949, Mrs. Dibble and her four children executed a tentative agreement for the division of the numerous properties whereby, in addition to certain personal assets, there would be allotted to her certain parcels, and to them other parcels, of real estate. The contemplated division appears to have been effected under date May 9, 1949, by two deeds: In one, Mrs. Dibble conveyed to Wortham W. Dibble, Annie Leak Bradley and Agnes D. Morris, and to Wortham W. Dibble as trustee for Thomas W. Dibble, twenty-seven parcels of real estate; in the other, Wortham W. Dibble, Thomas W. Dibble, Annie Leak Bradley and Agnes D. Morris conveyed to her twenty-two parcels. Under the same date Thomas W. Dibble and Wortham W. Dibble executed a trust agreement, reciting that Thomas had requested Wortham to hold as trustee for him his undivided one-fourth interest in the properties conveyed by Mrs. Dibble's deed just mentioned; that Wortham also held certain other real and personal property as trustee for Thomas; and declaring that all of said properties were so held by Wortham as such trustee, with power to possess, control, manage, mortgage, lease, sell and otherwise dispose of the same and invest and reinvest the proceeds as he might deem advisable, paying the net income to Thomas quarterly, with power in the trustee to invade the corpus if and when necessary for the support of Thomas and his family. The agreement further provided that the trustee should have discretionary power at any time to convey to Thomas all or any part of the trust assets, should be entitled to reimburse himself for all necessary expenses incurred in the administration of the trust, and should in addition be entitled to a commission of two and one-half per cent on all sums collected and a like percentage of all sums disbursed, commissions due and collectible in any calendar year to be considered as waived unless taken and accounted for in that year.

Under date May 9, 1949, there was also executed, by Wortham W. Dibble, Annie Leak Dibble Bradley, Agnes Dibble Morris and Thomas W. Dibble an agreement sup-

plemental to that of January 25, 1949, to the effect that the agreement of January 25 should also apply "to all gifts" received by any of them from their uncle, Samuel Dibble, during his lifetime, with the following exceptions:

"That the sum of $500.00 given to Thomas W. Dibble and the sum of $1,000.00 promised to Wortham W. Dibble for the benefit of Thomas W. Dibble shall not be included or charged against the said Thomas W. Dibble, and, further, that the said Thomas W. Dibble, in recognition of services to be rendered to the said uncle shall not be charged with any sum advanced to him for services rendered unless the said sum exceeds the amount of $600.00 in a six-months period and that, in this event, the excess over the sum of six hundreds (*sic*) received in any six-months period shall be so charged against the said Thomas W. Dibble."

The agreement of May 9 contained also the following provision:

"It is further agreed by all the parties that nothing in this agreement shall relate to any bequest or devise that the said Samuel Dibble shall make under and by virtue of his last will and testament and that none of the parties hereto, in connection with these agreements, shall be charged with any gift or bequest received from the said uncle through his last will and testament."

On September 20, 1950, Mrs. Dibble, whose husband had died in 1917, married his brother, the said Samuel Dibble. She was then eighty years of age; he was eighty-one.

On February 1, 1951, Samuel Dibble conveyed to Wortham W. Dibble as Trustee for Thomas W. Dibble, two tracts of land in Orangeburg County: (1) the "Swamp Land", containing about 166 acres; and (2) the "Still Place", containing about 475 acres. The deed, under seal, recited that it was made "in consideration of the sum of Five ($5.00) Dollars, and partial appreciation of years of unselfish service by Tom W. Dibble in the management of my lands and other affairs". South Carolina docu-

mentary stamps were affixed to it in the amount of $30.00; United States documentary stamps, in the amount of $18.50. The vital issue here is whether this conveyance was, or was not, a gift within the purview of the family agreement of January 25, 1949, as supplemented by that of May 9, 1949, and therefore to be shared by Thomas with his brother, Wortham, and his sisters, Mrs. Bradley and Mrs. Morris. The Special Referee and the Circuit Judge having reached opposite results on this issue, and the cause being in equity, it becomes our duty, to the extent that its solution involves challenged findings of fact, to review the evidence and draw from it our own conclusion. That duty does not require that we disregard the findings below, or that we ignore the fact that the Special Referee, who saw and heard the witnesses, was in better position than either this court or the circuit court to evaluate their credibility, nor does it relieve the appellant of the burden of convincing this court that the judgment appealed from was contrary to the preponderance of the evidence. *Twitty v. Harrison,* 230 S. C. 174, 94 S. E. (2d) 879; *Simonds v. Simonds,* 232 S. C. 185, 101 S. E. (2d) 494; *Chapman v. Scott,* 234 S. C. 469, 109 S. E. (2d) 1; *Watson v. Wall,* 239 S. C. 109, 121 S. E. (2d) 427.

As pointed out in the circuit court decree family settlements are favored by the courts and have generally been upheld against arguments that consideration for them was lacking. But in the present case neither the validity nor the propriety of the agreements of January 25 and May 9, 1949, is in question. The issue, as before stated, is simply this: Was the conveyance by Samuel Dibble a gift to Thomas within the purview of those agreements? For the answer to this question we must look to the deed itself, and to the intention of the parties to the family agreements as gathered from their testimony and from the circumstances surrounding the execution of the agreement of May 9, 1949, and the execution by Samuel Dibble, on February 1, 1951, of the deed before mentioned.

We do not think that the answer is to be found, as the Special Referee's report suggests, in the rule expounded in *All v. Prillaman,* 200 S. C. 279, 20 S. E. (2d) 741, 159 A. L. R. 981, and the cases there cited, to the effect that where a deed is under seal a consideration is thereby imported, and, in the absence of fraud, the grantor and those claiming under him will not be allowed to show that it was in fact without consideration. For the issue of consideration *vel non* here does not involve the validity of the deed as between the parties to it or those claiming under them; it is concerned only with the status of the conveyance in relation to the family agreements. It seems to us, therefore, that the deed in question bearing a seal, reciting a consideration, and having affixed to it documentary stamps indicating a substantial monetary consideration, while an important factor in the resolution of the issue here involved, is not in itself determinative of that issue, but should be considered in connection with the circumstances surrounding that transaction and the execution of the family agreement of May 9, 1949.

In 1928 Thomas W. Dibble, then about twenty-one years of age, was adjudged mentally incompetent. Between 1928 and 1949 he was from time to time, and for varying periods of time, under treatment at South Carolina State Hospital and other mental institutions. At times he was quite normal; at others his mind became cloudy; he was highly nervous when under strain or pressure. For 38 days during February and March, 1949, he was at Edgewood Sanatariam, where he underwent shock treatments. On May 9, 1949, he was adjudged mentally competent. In July, 1949, he was again under treatment at Edgewood. But the undisputed evidence of his periodic mental instability, and the fact that the shadow of adjudicated incompetence that had lain upon him since 1928 was not officially lifted until May 9, 1949, the date on which were executed the second family agreement, the cross-conveyances between Mrs. Dibble and her children, and the

trust agreement between himself and Wortham, fall far short of convincing us that, as his counsel suggest, he was in fact mentally incompetent on the date last mentioned or, for that matter, on January 25, 1949, when the first family agreement was executed. On the contrary, it is apparent from all of the evidence that he took an active part in the negotiations and discussions leading up the agreement of January 25; that he was familiar with real estate values and actively participated in making the appraisals upon which the division of the properties was based; and that it was he, rather than his brother Wortham, who under the advice of their attorney, the late Mr. Hugo S. Sims, worked out the details of the transaction.

The parties here are mature and well-educated; owners of substantial properties; and, except as to the appellant during his intermittent mental troubles, normal individuals. Their mother appears to have been the dominant member of their family, holding and managing much, if not most, of the family properties. Samuel Dibble, whose home adjoined that of their mother, appears also to have been a substantial property owner. In his later years he appears to have been in closer relationship with Thomas than with Wortham, who had moved to Columbia and later to Sumter, or with their sisters, one of whom, Mrs. Morris, was living in North Carolina, Mrs. Bradley, the other sister, lived for a good many years in North Carolina and Virginia, returning to Orangeburg in 1945. Thomas married in 1942; and after the birth of their child he and his wife and baby lived for a time in an apartment which his Uncle Samuel had prepared for them in his house. While it is clearly inferable from the evidence that Thomas was the favorite nephew, it also appears that Samuel Dibble was generously inclined to Wortham and his sisters also, the evidence showing that after the 1949 agreements he sold properties to Wortham at prices below their actual value.

At the base of the present controversy lies the agreement of May 9, 1949, and especially its proviso relating to Samuel

Dibble's will. Did the parties to the agreement have in mind a will that was then in existence, as well as any will that he might execute in the future? Here the testimony is in sharp conflict. Thomas testified that Samuel Dibble had made a will prior to May 9, 1949; that he had seen it; that it contained a devise to him of the Swamp property and the Still place; that the testator had told him that the devise was in payment for services that Thomas had rendered to him; that at the time of the execution of the agreement of May 9 Wortham knew of the existence of that will and had discussed it with him; that the proviso above mentioned was intended to exclude that property from the other provisions of that agreement; and that he, Thomas, would not have signed the agreement otherwise. Wortham, on the other hand, denied that on May 9, 1949, he knew of any such will or had had any discussion concerning it. But Thomas' testmony on this point is corroborated by that of Mrs. Morris, from which we quote:

"Q. And you knew at that time that Uncle Sammie had given the Still and Swamp property to Mr. Tom by a will?

"A. No, I was not sure of that.

\* \* \*

"Q. I am asking you if you were told it was in his will and you didn't believe it, is that correct?

"A. I was told it was Uncle Sammie's wish in his will. I was told that there had been a will like that.

\* \* \*

"Q. Then when you drew that family agreement Tom wanted that property to be excluded from it?

"A. He wanted something about a will to be excluded, over and above. I was not in accord with any of that, so I had a personal conference with Mr. Sims and asked his advice on it.

"Q. Tom didn't want that property which was in his will at that time to be included in that family agreement, is that right?

"A. That is what the agreement says.

"Q. And you were against it, is that right?

"A. In my heart, yes. I didn't think it was fair.

"Q. And you talked to Mr. Sims about it?

"A. In private.

"Q. After your conversation with Mr. Sims you reluctantly signed that family agreement?

"A. I wouldn't say reluctantly. He advised it."

And also by that of Mrs. Bradley, as follows:

"Q. Do you remember any discussion that took place among the four of you with reference to the agreement pertaining to Uncle Sam's property?

"I do.

"Q. Were all four of you present when this discussion took place; the four of you?

"A. Yes, as far as I know.

"Q. What do you recall being said that day, the best you can remember, and who said what?

"A. I remember Tom said he would sign it if, under Uncle Sam's will, what was in the Uncle's last will and testament, that would be excluded from this amendment, and I signed it.

"Q. Do you remember what discussion led up to the reasons for having such an agreement as this?

"A. Yes, I do. Somebody made a motion to include the Uncle. I had heard Tom say that the Uncle had willed him the swamp. I had never heard Uncle say it but I had heard Tom say it and I had heard mama say it. * * *

"Q. When you all were in Mr. Sims' office on May 9, 1949, I believe you told Mr. Thomas that at that time Mr. Tom Dibble said that he was not going to sign anything regarding your Uncle's estate unless the property that was given to him in the will was excluded, is that right?

"A. I said that he said he would not sign it unless what is in Uncle's last will and testimony (*sic*) stands.

\* \* \*

"Q. You had been informed the swamp was in there?

"A. Tom told me that he had gotten the uncle to make a will. Mama said under a lot of pressure.

"Q. Just answer my question and tell me whether or not you were informed that in the uncle's will Tom was given the swamp property.

"A. Tom had told me that he had uncle make a will leaving it to him.

"Q. So you don't remember about the Still property?

"A. No.

\* \* \*

"Q. You knew at that time that Tom was supposed to have the swamp property in there going to him?

"A. I knew it at that time."

We note in passing that in addition to that of Mrs. Bradley just quoted there was other testimony to the effect that the provision in Samuel Dibble's will devising the property in question to Thomas was the result of Thomas' insistence. But whether or not such was the fact is immaterial, for no question of undue influence is involved here.

The conveyance by Samuel Dibble to Thomas in February, 1951, resulted from Samuel's marriage in September, 1950, whereby his will had "possibly" been invalidated. According to Thomas' testimony, this information (concerning the effect of the marriage upon the existing will) had been imparted by Mr. Sims to both Thomas and Wortham. But there is conflict between the testimony of the two brothers as to the circumstances leading up to and attending the execution of the deed. Wortham's version was as follows:

Between the date of Samuel's marriage and the latter part of January, 1951, Thomas informed Wortham that he had tried without success to get Uncle Sam to make a new will. One evening in that January, when Wortham was at Tom's house, Tom said: "I cannot get uncle to make the will. I would like the swamp and Still place. Will you ask him to

give it to me. I need some occupational therapy. I have got to get out in the woods and have something to do." To this Wortham replied: that he would "ask uncle to give it to you"; that he (Wortham) was not interested in that property, but was interested in the "Sanders Place" that Tom owned, and that he was also interested in the "Jeff Fersner" place, that Samuel Dibble owned; that if Samuel would give Thomas the swamp and Still place, he (Wortham) would ask Samuel to sell him "at his asking price" the "Jeff Fersner" place; and if Samuel would make such sale he (Wortham) would have the "Jeff Fersner" place appraised, and he and Tom would together pay their sisters the difference between the purchase price paid by Wortham and the appraised value of the property; and that Tom would give him his interest in the "Jeff Fersner" place and full title to the "Sanders Place", and Wortham would give Tom his "purported one-fourth interest in the swamp and Still place;" that Tom was agreeable to this plan; and that thereupon Wortham went alone to Mr. Dibble's house, where, in the presence of Mrs. Dibble, he asked him if he would give Tom the swamp and the Still place; that after a little while Mr. Dibble said that he would do so if it didn't cost him anything; to which he replied that he would not have to pay the lawyer's fee, and that Mr. Sims would draw the deed, to which Mr. Dibble agreed. Thereupon Wortham went back to Tom's house. In response to his counsel's inqury as to what conversation he and Tom then had, he replied:

"A. Well, we got our heads together and I dare say that we worked out a phrase for consideration to go into the deed, which is basically the phrase that is used for a consideration which says, I don't recall the exact words, but is Five Dollars and for services rendered.

"Q. Why was that?

"A. Well, it was not desired for the face of it, on the record, to show——, there were other nieces and nephews, and here was a gift, and the thought was that would give a

dern good explanation why, when the deed was read, instead of just love and affection.

"Q. Was that discussed between you and Tom?

"A. Yes, sir.

"Q. Whose suggestion was that?

"A. I don't know, but I know it was agreed upon by Tom and myself that that would be the reflection in the deed."

Wortham also testified that he did not tell Thomas that the conveyance would not be subject to the family agreement of May 9; that he had nothing to do with the preparation of the deed; but that he made no objection to the deed being made to him as trustee.

Thomas' version, on direct examination, was as follows: that after having been advised by Mr. Sims of the possible effect of Uncle Samuel's marriage upon his previous will, both he and Wortham had several conversations with their uncle and Wortham persuaded him to make the conveyance to him as trustee for Thomas, Wortham assuring Thomas that it would not be subject to the second family agreement; that in the course of their conversations with Mr. Samuel Dibble the possibility that his prior will might be invalid was discussed, and also the question of whether the transfer of the property should be made by another will or by a deed, and it was agreed that it should be made by deed in consideration of services rendered. Under cross examination, he admitted that after his uncle's marriage he had tried to get him to make a new will; he admitted that he might have been mistaken in saying that he and Wortham had gone together to see their uncle; he denied having agreed with Wortham upon a trade of properties about which Wortham had testified; he denied knowledge of any discussion as to reciting a consideration in the deed for the purpose of concealing from Mr. Dibble's other nieces and nephews the fact that the deed was a gift; he stated that payment for the documentary stamps on the deed had been made by his uncle; he did not remember any discussion with Wortham

concerning the latter's interest in the purchase of the Jeff Fersner place. Asked by counsel cross examining him whether he thought that during cross examination his mind was clear, he replied that he thought so, but that he felt depressed and perturbed. Whatever the reason, his testimony under cross examination lacks positiveness, and gives the impression of uncertainty, to say the least, concerning the circumstances surrounding the execution of the deed in question.

In addition to the testimony that we have hereinbefore discussed, perhaps at too great length, certain undisputed facts revealed by the evidence appear pertinent to consideration of the question of the intent of the parties to the agreement of May 9, 1949, in its relation to a will of Samuel Dibble then in existence, respondents as well as the Circuit Judge having stressed the fact that no such will was produced in evidence.

1. Mrs. Margaret C. Ballard, who had been employed as secretary in the law firm of Zeigler and Brailsford between 1943 and 1949, testified that during that period she had typed a will for Mr. Samuel Dibble and had accompanied one of the members of the firm to Mr. Dibble's home, where it was executed in the presence of three witnesses.

2. Samuel Dibble died in 1952, leaving a will dated July 9, 1951, in which he appointed Wortham W. Dibble executor. Item VII of that will reads as follows:

"I hereby confirm the deeds of conveyance that I have made to my nephew, Thomas W. Dibble, giving him, in appreciation for his past services to me, my tract of land known as the 'Still Place' and, also, lands in the Edisto River Swamp near the City of Orangeburg; the gift of these tracts having been made by me in lieu of a provision contained in a former will for the benefit of the said Thomas W. Dibble."

3. Wortham W. Dibble testified that in the latter part of 1958, in the course of dismantling the house in which

Mr. Dibble had lived and the adjoining house in which Mrs. Annie L. W. Dibble had lived, miscellaneous papers were put into boxes and the boxes were divided among Thomas, Wortham, Mrs. Bradley and Mrs. Morris. There is no evidence as to whether or not the will testified to by Mrs. Ballard was found among those papers; but among the papers in one of the boxes that came to Wortham there was an earlier will of Mr. Samuel Dibble, dated in 1932.

4. It appears that although Wortham held title to the Swamp and Still places as trustee, he permitted Thomas to sell timber from the Still place directly to purchasers, and that it was not until his accounting in 1956 that Wortham listed himself and his sisters as having a beneficial interest in these properties.

Turning now to the question of whether the conveyance was supported by consideration, we note at the outset that the evidence as to just what services Thomas had rendered his uncle is not very specific. He testified that since about 1933 he had looked after his uncle's properties to the best of his ability, and that, with his wife, he had nursed and cared for him when he was sick. As before mentioned, during much of the time Wortham and his two sisters did not live in Orangeburg, and Thomas was therefore the only one in position to be of assistance to his uncle. But whether the services rendered by Thomas were great or small, and whether or not other relatives would have performed them *gratis* had they been in Thomas' position, are matters of no consequence. That such services to be rendered by Thomas after May 9, 1949, were considered by the other parties to the agreement of that date as being compensable is clearly indicated by the provision in that agreement excluding from its terms all payments that might be made to him for such future services, up to $600.00 in any six-months period. Nor is it of consequence that the market value of the services rendered by Thomas may have been less than that of the property conveyed to him; for we are here concerned with the existence or non-existence of a consideration for

the conveyance, not with its amount. Nor do we agree with respondents' contention that the use, in the deed, of the expression "in partial appreciation of years of unselfish service in the management of my lands and other affairs" negates the idea of compensation.

We have not overlooked the respondents' contention, upheld by the decree below, that this 'is not a case in which the court may with propriety consider the circumstances surrounding the execution of the agreement of May 9, 1949, in aid of its construction of the proviso in that agreement relating to bequests and devises under the will of Samuel Dibble because the plain, unambiguous language of that proviso shows that reference was to a future, and not to an existing, will. The proviso is a single sentence, which we repeat here for convenient reference:

"It is further agreed by all the parties that nothing in this agreement shall relate to any bequest or devise that the said Samuel Dibble shall make under and by virtue of his last will and testament and that none of the parties hereto, in connection with these agreements, shall be charged with any gift or bequest received from the said uncle through his last will and testament."

It is axiomatic that when a contract is clear and unequivocal its meaning must be determined by its contents alone. *McPherson v. J. E. Sirrine & Co.,* 206 S. C. 183, 33 S. E. (2d) 501; *White v. White,* 210 S. C. 336, 42 S. E. (2d) 537; *Bruce v. Blalock,* 241 S. C. 155, 127 S. E. (2d) 439. But it is also true, as pointed out in *Chatfield-Woods Co. v. Harley,* 124 S. C. 280, 117 S. E. 539, and in *Breedin v. Smith,* 126 S. C. 346, 120 S. E. 64, that the subject matter and purpose of the contract are to be considered in ascertaining the intention of the parties and the meaning of the terms they have used, and that the dry words of the contract should, if possible, be so interpreted as to subserve, not subvert, such intention. In the light of these principles and taking into consideration the

obvious intention of the parties that the family agreements should not apply to testamentary gifts that any of them might receive from their uncle, we do not think that the language of the above quoted proviso, taken as a whole sentence, clearly and unequivocally excludes reference to a will then existing.

Consideration of all the evidence convinces us:

1. That at the time of the execution of the agreement of May 9, 1949, there was in existence a will executed by Samuel Dibble containing a devise to Thomas W. Dibble of the two parcels of land here involved;

2. That the existence of that will was known to the parties when they executed the said agreement, and it was their intention to exclude that property from the provisions of the agreement;

3. That the conveyance of said property by Samuel Dibble to Wortham W. Dibble as Trustee for Thomas W. Dibble in February, 1951, was in consequence of the probability that Samuel's marriage a few months before had revoked his prior will, and its purpose was to vest in Thomas the exclusive beneficial ownership of such property in accordance with the intention of the former will; and

4. That the conveyance above mentioned was made for a consideration and was not a gift subject to the family agreements.

The judgment appealed from is therefore reversed, and the cause is remanded for further proceedings consistent with the views herein expressed.

Reversed and remanded.

Moss, Acting C. J., and Lewis and Bussey, JJ., concur.

Brailsford, J., did not participate.