0057

Venigee C. FRYAR, Respondent, v. B. W. CURRIN, Individually and trading and d/b/a Independent Tobacco Warehouse, Appellant.

(312 S. E. (2d) 16)

Court of Appeals

*James M. Connor*, Kingstree, *for appellant.*

*Allen C. Pate*, Florence, *for respondent.*

Jan. 30, 1984.

GOOLSBY, Judge:

This appeal principally involves an accounting for commissions received pursuant to a lease agreement between the appellant B. W. Currin and the respondent Venigee C. Fryar. The trial court held that Fryar was entitled to one-fifth of the net proceeds from the operation of the New Independent Tobacco Warehouse and that Currin was entitled to a reimbursement for only one-half of the expenditures made by him for improvements on the warehouse and for additional equipment. We reverse and remand the issue concerning Fryar's entitlement to a portion of the net profits and affirm the court's holding regarding the amount due to Currin as a reimbursement.

The issues presented on appeal are whether the trial court erred in including leaf account profits as commissions in making an award to Fryar and whether the trial court erred in failing to reimburse Currin for all funds expended by him on the warehouse improvements.

In April, 1973, Fryar and Currin entered into a lease agreement whereby Fryar leased her tobacco warehouse to Currin for a rental fee of $20,000 annually for 10 years beginning with the 1973 trading season. Under the lease, Fryar agreed to provide certain equipment and fixtures for the building and agreed to construct the warehouse floor in compliance with the regulations of the United States Grading Service. In addition, Currin agreed to pay Fryar one-fifth of all commissions he received trading and doing business as New Independent Tobacco Warehouse after deducting operating expenses.

At the time the parties entered into the lease, no warehouse existed. Fryar subsequently obtained detailed plans to build the warehouse on property adjacent to her home in Lake City. Fryar secured a construction loan and assigned the rental income of the warehouse and her share of the commissions to the lending institution to insure the loan's repayment.

During construction, the parties sought trading time from the Lake City Tobacco Board of Trade. The Board agreed to allocate selling time to the New Independent Tobacco Warehouse if, after an inspection of the warehouse on July 23, 1973, the day before the selling season was scheduled to begin, the warehouse was found to be in compliance with the standards specified in the contract. Basically, the standards required adequate lighting and sanitary facilities, reasonable ingress and egress, adequate safety of persons, and maintenance of the roof, walls, floors, and doors.

Between the years 1973 and 1979, Fryar received no commissions and brought this action for an accounting. Currin admitted that no commissions had been paid and filed a counterclaim seeking recovery of $40,315.19 advanced in 1973 for the completion of the warehouse. The case was tried before a master in equity who retired prior to submitting a report; however, the trial court, with the consent of the parties, considered the transcript of the testimony, written memoranda of law, and oral argument by counsel prior to rendering an order.

An action for accounting is equitable in nature. *Byrd v. King*, 245 S. C. 247, 140 S. E. (2d) 158 (1965). Since this is an action in equity and the master made no findings, we treat the case as one tried by a judge alone. The Court of Appeals, therefore, has jurisdiction to find facts in accor-

dance with its own view of the preponderance of the evidence. *Townes Associates, Ltd. v. City of Greenville*, 266 S. C. 81, 221 S. E. (2d) 773 (1976).

Currin argues that the trial court erred in determining that profits from a "leaf account" were embraced within the phrase "all commissions collected" under the lease agreement. "To ascertain the intention of an instrument, resort is first to be had to its language, and if such is perfectly plain and capable of legal construction, such language determines the force and effect of the instrument." *Blakeley v. Rabon*, 266 S. C. 68, 221 S. E. (2d) 767, 769 (1976); *Superior Auto Ins. Co. v. Maners*, 261 S. C. 257, 199 S. E. (2d) 719 (1973).

Prior to trial, both attorneys stipulated that the interpretation of the contract was not an issue. Currin's counsel thought the contract "speaks for itself;" and Fryar's attorney said about the language of the contract, "[I]t's clear and . . . unambiguous." The question before the court was "whether or not [Fryar] is entitled to any money under the provision of the contract which gave her one-fifth of all commissions collected after all operating expenses of the business had been deducted."

Even though counsel agreed that the lease agreement was unambiguous, they proceeded to introduce testimony as evidence on the meaning of the term "commission." Words in a contract are to be given their usual and ordinary meaning. J. Murray, *Contracts* § 121 (2d ed. 1974); 17 Am. Jur. (2d) *Contracts* § 251 (1964). The language contained in a contract must be given its ordinary meaning, except with technical language or where the context requires another denotation. *Blakeley v. Rabon, supra.*

Currin asserts that profits from a "leaf account" are entirely separate from "commissions." A leaf account is money received from a resale of tobacco purchased by a warehouse operator under a buyer's license. The warehouseman purchases the tobacco himself and will "rework" it to sell at a subsequent time. The money received from this sale is put into a leaf account. Commissions, on the other hand, are collected on all the tobacco which is sold. The money a warehouse receives from a person for selling his tobacco is a "commission."

Currin seeks to have the court apply the trade usage defini-

tion of the term "commission" to arrive at the true intention of the parties. "The usage of a trade . . . will always supersede the ordinary or popular sense of words. . . ." J. Murray, *Contracts* § 121 (2d ed. 1974). "[W]here trade custom or usage attaches a special meaning to certain words or terms used in any particular trade or business, it is competent for the parties . . . to show the peculiar meaning of [the words or terms] in the business or trade . . . not for the purpose of altering, adding to, or contradicting the contract, but for the purpose of elucidating the language used as a means of enabling the court to interpret the contract language according to the intention of the parties." 17 Am. Jur. (2d), *Contracts* § 251 (1964).

It is not necessary for us, however, to adopt the trade usage of the term "commission" in order to interpret the intention of the parties. The plain and ordinary meaning of the term suffices.

The plain and ordinary meaning of the word "commission" is a "fee paid to an agent or employee for transacting a piece of business or performing a service." *Webster's New Collegiate Dictionary* at 226 (1973). This definition encompasses the trade usage definition.

The trial court, therefore, erred in holding that Fryar was entitled to share in the profits from the leaf account. When the lease agreement was written, the parties did not intend that profits from the leaf account be included within the meaning of the term "commissions." The trial court's judgment awarding Fryar a share of these profits is hereby reversed.

Although we have reversed the trial court for including the profits from the leaf account as commissions, we find *ex mero motu* that Fryar is entitled to some relief. The record is replete with testimony that the expenses of the warehouse were excessive. Testimony revealed that the expenses were excessive in labor charges, in the salary paid Currin, and in amounts paid to the tradesmen. These expenses necessarily serve to dwindle the amount of the total commissions and to reduce Fryar's income from them.

The trial court, in its order, made a finding that Currin could "effectively avoid paying any commissions whatsoever to [Fryar] by simply increasing his salary, or that of his wife,

or paying out vast sums of money to tradesmen." In addition the trial court stated that the testimony of one witness "gave the Court grave concern about the reasonableness of the labor figures used by [Currin]." In spite of these statements, the trial court did not make any adjustments to the operating expenses. Instead, the trial court combined the profits from the leaf account with the commissions.

Because the evidence manifests excessive expenses and because the trial court voiced some concern about them, we remand to the trial court the question of the amount due Fryar as "commissions" after appropriate reductions have been made in the operating expenses and the amount of total commissions owed the warehouse for the sale of tobacco has been redetermined. In redetermining the latter amount, the court should include commissions due on the sale of tobacco from the leaf account because, as the record indicates, Currin sold the tobacco through the warehouse and "commissions," as we have defined the term, were due on *all* tobacco sales made through the warehouse.

The second issue addressed by Currin is that he should have been reimbursed for all expenditures made by him for the improvement of the warehouse and for additional equipment. Currin alleges that these improvements and equipment were necessary to pass inspection by the Lake City Tobacco Board. Fryar, on the other hand, says that the warehouse was adequate for inspection without them and that they were not necessary for an operational warehouse. While the trial court refused to order Fryar to reimburse Currin the entire amount of his expenditures, it did direct her to pay him one-half that amount because several of the additions and articles will belong to Fryar upon termination of the lease.

Regardless of whether the improvements and additional equipment were needed, neither the lease agreement nor the agreement with the Board contained any provision which required Fryar, as lessor of the warehouse, to pay for them. The trial judge concluded as much when he found that no agreement existed between the parties regarding repayments for anything. We agree with the trial judge that Currin was aware of Fryar's financial limitations when he undertook to improve the warehouse and to make the purchases and that he well knew that Fryar had no funds

available with which to reimburse him. Currin is in no position, therefore, to complain about the extent of the reimbursement. There was no error, then, in the trial court's judgment that Fryar repay Currin only one-half the sum spent by Currin for improvements to her warehouse and for warehouse-connected items. The judgment of the trial court on this issue is affirmed.

Affirmed in part, reversed in part and remanded.

SHAW and CURETON, JJ., concur.