**FLAIR BROADCASTING CORPORATION, J. Timothy Harrington, and John N. Boden, Plaintiffs,**

v.

**Heidi Schmid POWERS, Manley P. Caldwell, Jr., and Citicorp Trust, N.A., Personal Representatives of the Estate of Robert A. Schmid; Heidi Schmid Powers, individually; and Manley P. Caldwell, Jr., individually, Defendants.**

**BROADCASTING COMPANY OF THE CAROLINAS; and Heidi Schmid Powers, Manley P. Caldwell, Jr. and Citicorp Trust, N.A., Personal Representatives of the Estate of Robert A. Schmid, Counterclaim Plaintiffs,**

v.

**FLAIR BROADCASTING CORPORATION, J. Timothy Harrington, and John N. Boden, Counterclaim Defendants.**

89 Civ. 2528 (KC).

United States District Court,
S.D. New York.

March 16, 1990.

Irwin and Post, Frederick B. Polak and Mary H. Post, New York City, for plaintiffs/counterclaim defendants.

Richenthal & Birnbaum, P.C., David G. Richenthal, New York City, for defendants/counterclaim plaintiffs.

## MEMORANDUM OPINION AND ORDER

CONBOY, District Judge:

### BACKGROUND

This litigation involves a contract to sell a radio station in South Carolina. Flair Broadcasting Corporation, which was a Delaware corporation and is now a New Jersey corporation, and which has two shareholders John N. Boden and J. Timothy Harrington, was to be the Buyer (we will refer to these parties collectively as "Buyer" because of the counterclaim). Robert A.

Schmid (the "Seller") was, at all relevant times, the sole shareholder of Broadcasting Company of the Carolinas ("BCC" or the "Company") and was to sell to the Buyer his stock in BCC. BCC owned an AM–FM radio station based in Greenville, South Carolina called WESC. In August of 1988, Schmid died. The personal representatives of his Estate are his daughter, Heidi Schmid Powers, who is also the primary beneficiary of the Estate, Manley P. Caldwell, Jr., and Citicorp Trust, N.A., all of whom are parties to this action either individually or in their representative capacities (and whom we will include in the designation "Seller").

On September 23, 1987, the Seller and the Buyer entered into a Stock Purchase Agreement (the "Agreement") providing for the sale of all of the BCC stock to the Buyer.[1] The Agreement, which is quite long and detailed, is found at Exhibit A to the Affidavit of J. Timothy Harrington, sworn to May 21, 1989, and is governed under the law of South Carolina. *See* Agreement § 12.08. It is not necessary to detail all of the events as they transpired between the parties; it suffices to say that the transaction was not consummated. In essence, the question the parties are asking us to decide is who, if anyone, breached the Agreement. The Buyer claims the transaction was not consummated because the Seller did not perform all of its obligations under the Agreement which were conditions precedent to the Buyer's obligation to close, to wit: the Seller did not terminate the pension plan in the manner provided in section 4.07 of the Agreement.[2] The Seller claims that it fully or substantially performed all of its obligations under the Agreement, and that it was the Buyer who breached the Agreement by failing and refusing to close the deal because it was unable to assemble the financing. The Seller also claims that because the deal was not consummated, through no fault of its own, on the Closing Date of January 15, 1988, it was entitled to draw on the $500,000 in letters of credit provided by the Buyer pursuant to § 1.04 of the Agreement.[3] The Buyer claims that the Seller

---

1. This Agreement codified a "letter of intent" agreed to by the parties on June 19, 1987.

2. Because the interpretation of this section is of crucial importance to this litigation, we will quote it in its entirety.

   4.07 *Termination of Pension Plan.* As soon as practicable and in all events prior to the Closing Date, Seller [Schmid] shall cause Company [BCC] to take the following actions with respect to the Pension Plan: (i) amend the Pension Plan to cease all benefit accruals and fully vest participants in their accrued benefits as of the earliest date permitted by Section 204(h) of ERISA, (ii) promptly issue the notice to participants and beneficiaries required by Section 204(h) of ERISA as soon as practicable after such is made, (iii) all other actions necessary to terminate the Pension Plan effective as the earliest date permitted under applicable law, but in no event later than the date before the Closing Date, in accordance with the terms of the Pension Plan and the procedures for standard terminations of single-employer plans contained in Section 4041 of ERISA, and (iv) file Form 5310 (and all required attachments) with the IRS to secure a determination that the Pension Plan as amended and terminated, continues to be a qualified plan. Buyer shall have the right to review all materials that are to be distributed to participants or beneficiaries or filed with a government agency in connection with the termination of the Pension Plan before such materials are distributed or filed, and such materials may not be distributed or filed without Buyer's Consent. Within ten (10) days after demand by Buyer, Seller shall reimburse Buyer or Company, as directed by Buyer, for all reasonable costs relating to the termination of the Pension Plan and the distribution of benefits hereunder that are incurred on or after the Closing Date or are not reflected on the Closing Statement or the Closing Balance Sheet. Notwithstanding anything herein to the contrary, if the assets of the Pension Plan are not sufficient to discharge all Benefit Commitments for any reason: (i) Company shall contribute sufficient assets to the Pension Plan to discharge all such Benefit Commitments, and (ii) if such contribution is made on or after the Closing Date or is not reflected on the Closing Statement or the Closing Report, Seller shall pay Buyer or Company, as directed by Buyer, the amount of such contribution within ten (10) days after demand by Buyer.

3. This section provides in relevant part that:

   1.04 *Letter of Credit and Breach of Agreement.* Contemporaneously with the execution hereof, Buyer has delivered to Seller irrevocable letters of credit in the form of Exhibit A attached hereto ("Letter of Credit") in the aggregate amount of Five Hundred Thousand Dollars ($500,000.00) to be held by Seller in accordance with the provisions of this Agree-

was and is not entitled to this money and seeks its return.

This litigation has a somewhat checkered history which we will explain briefly. On or about May 4, 1988, Schmid and BCC commenced a declaratory judgment action against the Buyer in the United States District Court for the District of South Carolina, in which it sought a judgment that it was entitled to draw upon the letters of credit and keep the money as liquidated damages. In mid-November of 1988, the Buyer sought to have that action dismissed on various grounds, including improper venue. At the same time, the Buyer commenced an action against the Seller in the District of New Jersey, which the Seller moved to dismiss on January 10, 1989, alleging, *inter alia*, that the Seller had breached the Agreement. On January 23, 1989, the court in South Carolina dismissed the action there on the ground of improper venue, finding that venue was more appropriately laid in New York. On April 7, 1989, the court in New Jersey dismissed the action for lack of personal jurisdiction. The instant action was filed in this Court on April 14, 1988 and the counterclaim was filed May 31, 1989. On December 27, 1989, the Fourth Circuit Court of Appeals affirmed the decision of the district court in South Carolina. *Broadcasting Company of the Carolinas v. Flair Broadcasting Corporation*, 892 F.2d 372 (4th Cir.1989). Accordingly, we are now the only Court where there is litigation pending between all of the named parties.

There are three voluminous motions before this Court. First, there is the Buyer's motion for partial summary judgment, seeking a judgment that the Seller's Estate is liable for the purported breach by the Seller and that the Estate is liable for conversion of the $500,000 letters of credit. At this time, the Buyer does not seek judgment on its various other tort theories alleged in the complaint,[4] nor does it seek to assess the amount of damages. Also before the Court is the Seller's cross-motion for summary judgment on its counterclaim, by which the Seller seeks a declaration that it did not breach the contract, rather the Buyer did, and therefore it is entitled to keep the $500,000. Finally, there is a motion by the Buyer to strike certain of the affidavits submitted by the Seller on the cross-motion and in opposition to the Buyer's motion. We will address the question of whether the affidavits should be stricken before we deal with the merits of the summary judgment motions.

## ANALYSIS

### A. *Motion to Strike*

■ The Buyer requests, by extensive letter motion dated November 21, 1989, that we strike the affidavits of Grady Hubbard and William Blount, both sworn to on June 27, 1989, and submitted by the Seller in support of its motion for summary judgment and in opposition to the Buyer's motion. The Buyer cites *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) and *In re Teltronics Services, Inc.*, 762 F.2d 185, 192 (2d Cir.1985) in support. The bases for the Buyer's objections to these affidavits essentially are that depositions of these individuals taken after the submission of their affidavits conclusively demonstrate that the affidavits contained untrue and misleading statements and that one of the affidavits was not made on

---

ment. If the transactions contemplated by this Agreement are consummated in accordance with the terms hereof, the Letter of Credit shall be returned to Buyer by Seller upon Closing on the Closing Date. In the event that Buyer shall fail or refuse to consummate and close this Agreement on the Closing Date, all conditions to Buyer's obligation to close having been satisfied, or if Buyer shall commit a material breach of or a default under any representation, warranty, covenant or agreement herein, which is not cured as provided in Section 10.01 hereof, Seller shall be entitled to draw upon the Letter of Credit in the amount of Five Hundred Thousand Dollars ($500,000.00) as Seller's liquidated damages in lieu of any such action for damages (the parties hereto recognizing that the amount of damages which may be suffered by Seller in consequence of any such breach or failure to perform hereunder by Buyer may be difficult or impossible to quantify)....

4. The other claims include tortious interference with contract, tortious interference with prospective economic advantage and defamation.

personal knowledge as required by Federal Rule of Civil Procedure 56.[5] Taking the Hubbard Affidavit first, we agree with plaintiff that the subsequent deposition testimony indicates that the key portion of the affidavit, specifically paragraph 6 relating to the termination of the pension plan, was not made on personal knowledge. Accordingly, we grant the Buyer's motion to strike that paragraph.[6]

■ With respect to the other portions of the Hubbard Affidavit as well as large sections of the Blount affidavit, the Buyer contends that these should be stricken because they contain information which is untrue and/or misleading. To support this contention, the Buyer has set forth in manageable, tabular form the disparities in the deposition and affidavit testimony. However, the cases cited by the Buyer do not support striking the affidavits on the ground that they contain false or misleading information; rather, the cases involve situations where affidavits contained hearsay and were not submitted on personal knowledge. This distinction is crucial. We are now faced with two essentially antithetical and inconsistent accounts by the same individuals as to what the terms of the Agreement were intended to mean. The Buyer would have us strike the affidavits because that testimony is less favorable to the Buyer. Were we to do so, however, we would be making a determination that the deposition testimony is the more credible. It is not appropriate to make such a credibility determination at this time and, accordingly, we cannot and will not strike these affidavits, or the portions thereof, on the ground that they are false and/or misleading.[7]

### B. Summary Judgment Motions

As for the summary judgment motions, each side incredibly argues that, despite the volume of adverse documents submitted, there are no genuine issues of fact which preclude the grant of summary judgment in its favor. There are basically five issues which are raised on the summary judgment motions. They are: what is the meaning and intent of section 4.07 regarding termination of the pension plan; whether the conduct mandated by section 4.07 was a condition precedent to the Buyer's obligation to close; if section 4.07 is indeed a condition precedent under the Agreement, whether this condition may be waived by conduct or whether a waiver must be in writing; whether the closing date was "of the essence"; and whether the letters of credit posted pursuant to § 1.04 of the Agreement were "earnest money" or "liquidated damages."

■ Before we focus on these issues, it is necessary to examine the relevant principles of contract construction, particularly in the context of motions for summary judgment. The parties agree that South Carolina provides the controlling substantive law and that the standards for summary judgment under Federal Rule of Civil Procedure are also applicable. Rule 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Court must first look to the substantive law of the case to determine which facts are material. Only dis-

---

**5.** Rule 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e).

**6.** Of course, to the extent that any of the affidavits contain legal argument or conclusion, the parties are assured that those impermissible sections were not considered by us on this motion. *United States v. Alessi,* 599 F.2d 513, 515 (2d Cir.1979); *Chambless v. Masters, Mates & Pilots*

*Pension Plan,* 571 F.Supp. 1430, 1439 (S.D.N.Y. 1983).

**7.** We note that in view of our analysis, *infra* at 184–86, with respect to the construction of section 4.07 of the Agreement, these affidavits are not necessary to the construction of what actions the parties intended be undertaken to terminate the pension plan as we can ascertain the intent of the parties by examining the language of the text, without resort to extrinsic evidence.

putes over material facts will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that no genuine dispute as to material facts exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to show that a genuine issue of fact exists. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). We observe that disputed "legal questions ... present nothing for trial and [are] appropriately resolved on a motion for summary judgment." *Holland Indus. v. Adamar of New Jersey, Inc.*, 550 F.Supp. 646, 648 (S.D.N.Y.1982) (legal questions relating to contract and statutory interpretation did not preclude summary judgment). Similarly, legal arguments presented in affidavits are no more sufficient to create a factual dispute than legal memoranda and oral argument. *See* 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.22; *see also Jersey Central Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir.1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); *New York State Energy Research and Development Authority v. Nuclear Fuel Servs. Inc.*, 561 F.Supp. 954, 960 (W.D.N.Y.1983) (affidavits were defective since they contained legal argument and interpretation).

■ "Where a motion for summary judgment presents a question concerning the construction of a written contract, the question is one of law if the language employed by the contract is plain and unambiguous." *Moss v. Porter Bros., Inc.*, 292 S.C. 444, 357 S.E.2d 25, 27 (Ct.App. 1987); *First–Citizens Bank & Trust Co. v. Conway Nat'l Bank*, 282 S.C. 303, 317 S.E.2d 776, 777 (Ct.App.1984). Where the intention of the parties may be gathered from the four corners of the agreement, summary judgment is appropriate. *Moss*, 357 S.E.2d at 27; *First–Citizens*, 317 S.E.2d at 777.

■ The South Carolina Court of Appeals recently set forth the rules governing the construction of contracts.

In construing a contract, the primary objective is to ascertain and give effect to the intention of the parties. *Williams v. Teran, Inc.*, 266 S.C. 55, 221 S.E.2d 526 (1977); *Bruce v. Blalock*, 241 S.C. 155, 127 S.E.2d 439 (1962). The parties' intention must, in the first instance, be derived from the language of the contract. *Superior Automobile Insurance Co. v. Maners*, 261 S.C. 257, 199 S.E.2d 719 (1973). If its language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and the contract's language determines that instrument's force and effect. *Blakeley v. Rabon*, 266 S.C. 68, 221 S.E.2d 767 (1976); *Fryar v. Currin*, 280 S.C. 241, 312 S.E.2d 16 (Ct.App.1984). Mere lack of clarity on casual reading is not the standard for determining whether a contract is afflicted with ambiguity. *McCann v. Glynn Lumber Co.*, 199 Ga. 669, 34 S.E.2d 839 (Ga.1945).

*Gamble, Givens & Moody v. Moise*, 288 S.C. 210, 341 S.E.2d 147, 150 (Ct.App.1986); *accord Jacobs v. Service Merchandise Co. Inc.*, 297 S.C. 123, 375 S.E.2d 1 (Ct.App. 1988). Accordingly, there is no resort to extrinsic evidence if the intention of the parties can be determined from the terms of the agreement itself. *E.g., Dibble v. Dibble*, 248 S.C. 165, 149 S.E.2d 355, 364 (1966); *Beard v. Ryder/P–I–E Nation-*

2

85

*wide, Inc.*, 292 S.C. 250, 355 S.E.2d 872, 875 (Ct.App.1987). Furthermore, "when the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention." *Hellams v. Harnist*, 284 S.C. 256, 325 S.E.2d 569, 571 (Ct.App.1985) (citing *McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 33 S.E.2d 501, 509–10 (1945)).

On the question of whether a term is a condition precedent, the case of *Ballenger Corp. v. City of Columbia*, 286 S.C. 1, 331 S.E.2d 365, 368 (Ct.App.1985) is instructive. There, the court set forth the relevant law:

> Whether a stipulation in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties to be gathered from the language they employ.... Words and phrases such as "if," "provided that," "when," "after," "as soon as," and "subject to" frequently are used to indicate that performance expressly has been made conditional.

*Id., see also Cobb v. Gross*, 291 S.C. 550, 354 S.E.2d 573, 574 (Ct.App.1987).

■ Having identified the relevant legal standards, we now proceed to the issues raised by the parties. With regard to the Buyer's assertion that the Seller did not perform all of its obligations under the contract prior to the closing, the most important question concerns what the parties intended by § 4.07 of the Agreement, entitled "Termination of the Pension Plan." The Seller, in an attempt to create an ambiguity in the contractual language where there is none, asserts that it was not obligated to "complet[e] every detail of the pension termination process," but rather that the parties only intended that the Plan be terminated. In other words, to the Seller, there is a difference between the Plan being "terminated" and the completion of the "termination process," and that the parties intended only the former. To support this proposition, the Seller has submitted affidavits by actuaries for BCC, as well some of the company's officers. The Seller also asserts that the Plan was terminated and therefore it complied with its obligations under the contract. The Buyer, on the other hand, contends that Section 4.07 of the contract did not speak of a "termination process" or even "termination," but that it required the Seller to accomplish a list of tasks with reference to the termination of the Plan before the Buyer was obligated to close.

The Seller's argument is founded upon its assertion that the Buyer was focussing on only "a single phrase" in section 4.07, and that a careful reading of the entire section 4.07 as well as the rest of the contract indicates that the parties could not have intended that the Plan would have been completely terminated prior to the closing. *See* Seller's Main Memorandum of Law at 10–15. Upon examination of the entire section 4.07, we agree that there are particular events that the parties clearly intended might occur after the closing, such as the distribution of benefits under the Plan. However, we conclude that the same paragraph of the Agreement is unambiguous in mandating that the Seller take certain actions before the Closing of the deal, to wit: amendment of the Plan (§ 4.01(i)), prompt written notice of the plan amendment (§ 4.07(ii)), all actions required to terminate the plan under section 4041 of ERISA [29 U.S.C. § 1341] as of "the earliest date permitted under applicable law, but in no event later than the date before the Closing Date" (§ 4.07(iii))[8]; and filing of "Form 5310 (and all required attachments) with the IRS" (§ 4.07(iv)). Indeed, contrary to the Seller's assertion that the Buyer was relying on a single phrase in section 4.07, it is stated twice in the first part of section 4.07 that all of these events would take place "[a]s soon as practicable but in all events prior to the Closing Date" or "in no event later than the date before the Closing Date." Furthermore, if we look to other sections of the Agreement,

---

**8.** These actions include written personal notice to affected parties of the intent to terminate; filing of a notice of intent to terminate with the Pension Benefit Guaranty Corporation ("PBGC") on the proper form; submission, again on the proper forms, to the PBGC of certifications of an enrolled actuary and by the Plan Administrator; and notice to each plan participant and beneficiary of the amount of benefit commitments. 29 U.S.C. § 1341.

they also provide support for this conclusion. For example, section 7.02, entitled "Performance Obligations of Seller," states that the "seller shall have performed ... and shall have caused the company to have performed all covenants and agreements required to be performed by it prior to the Closing Date." Thus, we conclude, as a matter of law, that there is only one reasonable interpretation of this clear and unequivocal language: the actions listed above regarding the filing of forms with the IRS and the PBGC and the notification of interested parties had to be performed by the Seller, with the performance thereof a condition precedent to the Buyer's obligation to close on a certain date. Furthermore, we reject the Seller's argument that this construction of the contract would produce "an absurd result," which argument is founded upon the assertion, without any sort of evidentiary proof, that these obligations would take a year to fulfill and "the closing was scheduled as soon as possible." [9]

The next question is whether the Seller complied with all of these obligations and thus fulfilled the condition precedent to the Buyer's performance. The Buyer has come forth with evidence that the Seller did not take all of the actions required under section 4.07 prior to January 15, 1988, the date the Seller set for the closing. For example, the Buyer has demonstrated that with the possible exception of the Termination notice dated September 21, 1987,[10] none of the documents referred to in Section 4.07 were distributed or filed until long after January 15, 1988. Affidavit of Mary H. Post, sworn to on May 23, 1989, at ¶ 6 and Exhibit F appurtenant thereto. Indeed, the letter purporting to transmit many of the relevant forms to the IRS was dated February 8, 1988. *Id.* Moreover, it appears that prior to January 26, 1988, BCC had not even been authorized to amend its Pension Plan, or to generate, file or distribute the necessary documents or otherwise act to terminate the plan. *Id.* The Seller has made no attempt to contest this evidence. Thus, in light of all of the foregoing, we conclude that there is no genuine issue of fact precluding us from holding, as we hereby do, that the Seller had not satisfied certain of its obligations under the Agreement, which obligations were a condition precedent to the Buyer's performance under the contract.

█ In lieu of disputing the evidence that it did not comply with its obligations under section 4.07 of the Agreement, the Seller argues that if we find, as we have, that these obligations comprise a condition precedent, the Buyer waived strict compliance with this condition. *See* Seller's Main Memorandum of Law at 15–17; Seller's Reply Memorandum of Law at 4–6. The Seller further contends that the Buyer repudiated the contract in late December and thus is estopped from relying on any such condition. *See* Seller's Main Memorandum of Law at 17–18; Seller's Reply Memorandum of Law at 4–6. To rebut the waiver argument, the Buyer points to section 12.04 of the Agreement which clearly and unequivocally provides that there can be no waiver of any term, condition or provision of the Agreement "unless evidenced by a writing duly executed by the party sought to be charged with such waiver or consent." The Seller has come forward with no case authority suggesting that a waiver, as that term is defined, can be implied by conduct despite the contractual necessity of a writing. Accordingly, we reject the Seller's assertion that a waiver by the Buyer excused performance of the condition precedent by the Seller. If, however, we

---

**9.** We observe that the assertion that the closing was scheduled as soon as possible is arguably deceptive, since the parties explicitly agreed that in no event would the closing occur prior to January 4, 1988. *See* Agreement § 9.01. Furthermore, there is no indication in the record that the filing and distribution of all of the required documents would in fact take a year, an impossibility given the "drop dead date" of July 31, 1988, nor is there evidence that these

acts could not, in fact, be performed in three and one-half months, the period between the signing of the Agreement and January 15, 1988, the Closing Date set by the Seller.

**10.** We include this document here in light of the issues raised as to whether it was distributed in accordance with the procedures outlined in the ERISA statute.

are provided with case authority permitting this argument, we will allow the issue of waiver to be explored further at trial.

■ With regard to the contention that the Buyer repudiated the Agreement and therefore should be estopped from relying on the condition precedent, we believe genuine issues of fact remain. Specifically, there are questions as to whether the communications by Jacques D. Kerrest, a Vice President of Corporate Finance at Chemical Bank, constitute (1) an *"anticipatory breach"* of the contract (2) *by the Buyer.* Even if the communications can be so construed, we doubt that the Seller could demonstrate that this repudiation "contributed materially" to the nonoccurrence of the condition precedent to the Buyer's duty to perform. *See Champion v. Whaley,* 280 S.C. 116, 311 S.E.2d 404, 406–07 (Ct.App. 1984). However, we leave this question of whether there was an anticipatory repudiation of the contract by the Buyer for resolution by the trier of fact and, accordingly, this branch of the Seller's motion for summary judgment is denied on this ground.

■ In its summary judgment motion, the Seller asserts that the Closing Date was "of the essence." We are uncertain of the continued relevance of this contention of the Seller in light of our holding with regard to the condition precedent. Assuming the issue is still relevant, however, we do not believe that we are able to make this determination as a matter of law at this time. First, as the Seller concedes, there is no language in the contract expressly stating that "time is of the essence" with regard to a set closing date. *See* Seller's Reply Memorandum of Law at 7. Consequently, the Seller relies on letters by counsel for the Seller to counsel for the Buyer for the proposition that the conduct of the parties leaves no room for doubt that time was of the essence to the closing. Since we conclude that the Buyer has raised material, triable issues as to whether the Agreement was so modified, *i.e.,* whether the correct individual was notified regarding the modification of the Agreement and

whether the time allowed was reasonable under the circumstances, *see Bishop v. Tolbert,* 249 S.C. 289, 153 S.E.2d 912, 918 (1967), this issue will also be left for the trier of fact.

The final issue for resolution on the motions for summary judgment is whether the letters of credit posted pursuant to section 1.04 of the Agreement were to constitute "liquidated damages" as the Seller contends.[11] The Buyer asserts that these letters of credit were "earnest money" and that they bore no relationship to any damages that might flow from the Buyer's non-performance. Buyer's Reply Memorandum of Law at 13. "[T]he question of whether a sum fixed in a case of nonperformance is liquidated damages or a penalty can be determined by the trial judge or a question of fact to be determined by the jury." *Rental Uniform Serv. of Greenville, South Carolina, Inc. v. K & M Tool & Die, Inc.,* 292 S.C. 571, 357 S.E.2d 722, 723 (Ct.App.1987) (citing *Benya v. Gamble,* 282 S.C. 624, 321 S.E.2d 57, *cert. dismissed,* 329 S.E.2d 768 (1985)). "[T]he question of whether a sum stipulated to be paid in case of breach of an agreement is to be regarded as liquidated damages or a penalty is one of construction and is generally determined by the intention of the parties." *Id.* at 724 (citing *Retailers Service Bureau, Inc. v. Smith,* 165 S.C. 238, 163 S.E. 649 (1932)). Having carefully examined the language in section 1.04 of the Agreement, we believe it is more likely than not that the parties intended that the $500,000 constitute liquidated damages and not a penalty. However, we will not preclude the Buyer from making an offer of proof to the contrary at trial, *see K & M Tool & Die,* 357 S.E.2d at 724, at which time we will determine whether the issue should be left for the jury or decided by the Court.

In sum, the Seller's motion for summary judgment is denied in its entirety, and the Buyer's motions to strike and for summary

---

11. Of course, this conclusion is only germane if the trier of fact concludes that the performance

of the condition by the Seller was excused for whatever reason.

judgment are each denied in part and granted in part.

SO ORDERED.